# FOR PUBLICATION

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| SAVED MAGAZINE, a Washington limited liability company; AFSHIN YAGHTIN, and the marital community thereof; MARY FELL YAGHTIN, and the marital community thereof,<br>    *Plaintiffs-Appellants,*<br><br>v.<br><br>SPOKANE POLICE DEPARTMENT; CRAIG N. MEIDL, in his official and personal capacity; JANE DOE, and the marital community thereof; JOHN DOE, and the marital community thereof,<br>    *Defendants-Appellees,*<br><br>and<br><br>CITY OF SPOKANE, a municipal corporation in and for the State of Washington; SPOKANE PUBLIC LIBRARY; KEVIN VAUGHN, and the marital community thereof; JANE DOE VAUGHN, and the marital community,<br>    *Defendants.* | No. 20-36073<br><br>D.C. No.<br>2:20-cv-00024-RMP<br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Rosanna Malouf Peterson, District Judge, Presiding

Argued and Submitted October 4, 2021
Seattle, Washington

Filed December 9, 2021

Before: A. WALLACE TASHIMA, MILAN D. SMITH, JR., and JACQUELINE H. NGUYEN, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**SUMMARY**[*]

**Civil Rights**

The panel affirmed the district court's dismissal of an action brought pursuant to 42 U.S.C. § 1983 by Afshin Yaghtin and Saved Magazine alleging that Spokane police officers violated plaintiffs' First Amendment rights when they prevented Yaghtin, acting as a journalist at a public event, from "engaging in dialogue with a protester" under threat of arrest.

In June 2019, the Spokane Public Library hosted a children's book reading event called "Drag Queen Story Hour." Because the library event proved controversial, the police separated 150 protesters and 300 counterprotesters

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

into separate protest and counterprotest zones near the library. Yaghtin arrived at the event wearing a press badge and identified himself to police officers as a member of the press. Yaghtin alleges he was assigned a police "detail" to accompany him through a crowd of counterprotesters out of concern that he was "fake press." While Yaghtin was walking through the counterprotest zone, he began to converse with a counterprotester, who had asked him whether he was the person that had previously advocated for the execution of gay people. Officer Doe interrupted the exchange, and then escorted Yaghtin through the counterprotest zone.

The panel held that Officer Doe was entitled to qualified immunity under the second prong of the qualified immunity analysis, which asks whether the constitutional right was clearly established at the time of defendant's alleged misconduct. The panel noted that plaintiffs did not challenge a city ordinance or permit scheme, and they expressly did not challenge the Spokane Police Department's use of separate protest zones. Instead, plaintiffs' challenge was directed at Officer Doe's enforcement of these zones. The panel was not aware of any precedent that would alert Officer Doe that his enforcement would violate clearly established First Amendment law. Considering the lack of any precedent to the contrary, it was not unreasonable for Officer Doe to believe that it was lawful for him to examine the substance of Yaghtin's speech in order to enforce the separate protest zone policy.

The panel held that the City of Spokane could not be held liable because even assuming Spokane police officers violated Yaghtin's First Amendment rights, nothing in the complaint plausibly alleged a policy, custom, or practice leading to that violation. Plaintiffs' allegations amounted to

no more than an "isolated or sporadic incident" that could not form the basis of liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

## COUNSEL

Kevin T. Snider (argued), Pacific Justice Institute, Sacramento, California; Tracy Tribbett, Pacific Justice Institute, Paco, Washington; for Plaintiff-Appellant.

Taki V. Flevaris (argued), Alanna Peterson, and Gregory J. Wong, Pacifica Law Group, Seattle, Washington; Salvatore J. Faggiano, Office of the City Attorney, Spokane, Washington; for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Plaintiffs Afshin Yaghtin and Saved Magazine allege that Spokane police officers violated their First Amendment rights when they prevented Yaghtin, acting as a journalist at a public event, from "engaging in dialogue with a protester" under threat of arrest. We affirm the district court's order dismissing this case with prejudice.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.**

In June 2019, the Spokane Public Library hosted a children's book reading event called "Drag Queen Story Hour." The event proved controversial, so the police separated approximately 150 protesters and 300 counterprotesters into separate protest and counterprotest zones near the library. The protesters gathered to express their "concern about the drag queens" and their opposition to the library's sponsoring the event. Counterprotesters gathered in support of the event.

Yaghtin is both the chief editor of and a journalist for Saved Magazine, and sought to cover the Drag Queen Story Hour event for an edition of an upcoming quarterly periodical. He arrived fifteen minutes before the event began wearing a press badge, and identified himself to police officers as a member of the press. Yaghtin stated that he intended to interview protesters and counterprotesters for his upcoming story. Spokane Police Officer Vaughn acknowledged Yaghtin's claim that he was a member of the press and escorted him to the entrance of the library.

Officer Vaughn then warned Yaghtin that he would be subject to arrest if he started "engaging people" or caused "a problem," but told Yaghtin if he wanted to "act as the press and report on [the event], you can do that." An individual accompanying Yaghtin then asked Officer Vaughn what would happen if a counterprotester began attacking Yaghtin, and Officer Vaughn replied, "the same thing applies to them, if they are causing problems then they will go to jail."[1] Officer Vaughn also warned Yaghtin that he might have problems with counterprotesters "saying things because they know you were arrested last week, so people are going to say things."[2]

Yaghtin alleges he was assigned a police "detail" to accompany him through a crowd of counterprotesters out of concern that he was "fake press." After speaking with Yaghtin, Officer Vaughn alerted "all units" that the subject who "was arrested last time is on scene with a press pass, [and] will be allowed to move freely throughout the event on

---

[1] On review, we treat as true facts alleged in the amended complaint, including four videos depicting the underlying incident that the district court held were incorporated by reference into the complaint. Plaintiffs did not challenge the district court's ruling on this issue, and do not try to do so on appeal.

[2] Plaintiffs' amended complaint quotes from, and provides a hyperlink to, a newspaper article with additional factual background about the Drag Queen Story Hour event, which Defendants submitted as an exhibit to their motion to dismiss. The article suggests that the book reading event described in the amended complaint was the second of two similar events, and that Yaghtin had been arrested during the first event. The district court did not refer to this article, and we do not rely on any facts therein for the disposition of this case, so it is unnecessary to determine the extent to which the incorporation-by-reference doctrine might apply. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

both sides, until he starts causing problems with either group. He's been warned if he does that, then he's subject to arrest."

Yaghtin then walked to the sidewalk outside the library to interview counterprotesters. While Yaghtin was walking through the counterprotest zone, a counterprotester asked him, "Aren't you the one who advocated for execution of gay people?" Yaghtin responded, "No that is what the Bible says . . ." and began to converse with the counterprotester until Officer Doe interrupted the exchange, saying:

> Ok, you are not exercising your press rights. If you want to report the story you can . . . it is not your job to answer his questions . . . you are engaging [the counterprotestor] on political topics . . . you need to act like the press and not try to take a political view . . . you can't preach the Bible to people . . . I heard you say something about the Bible.

Yaghtin told Officer Doe that he was "asked a question" and "was there to comply." Yaghtin stated that he was "not engaging . . . anyone today," and only intended to "walk through." Yaghtin then asked Officer Doe if he needed "to go to the other side of the street," and Officer Doe responded that he "did not say that." Yaghtin indicated, "I'd like to go through [the counterprotest zone] please," and Officer Doe directed counterprotesters to "get out of the way" and let Yaghtin continue to move through the zone. After Yaghtin walked through the counterprotest zone, he told Officer Doe that he appreciated the protection.

A few days after the event, Yaghtin's lawyer wrote to Spokane Police Chief Meidl asking whether Officer Vaughn's telling Yaghtin that he would be subject to arrest

if he engaged people or caused problems, represented "the practices, policies, and official position" of the Spokane Police Department.  An Assistant City Attorney responded, asking for any information that might show the police interfering with Yaghtin's press rights.  Yaghtin's counsel sent the City Attorney two videos depicting the interaction between the police officers and Yaghtin during the Drag Queen Story Hour event.  After further email exchanges, the City Attorney told Yaghtin's counsel that the city would "review and evaluate what you have submitted" and welcomed suggestions in the meantime to improve city employee trainings.

## II.

In January 2020, Plaintiffs filed a complaint against the City of Spokane, the Spokane Police Department, Police Chief Meidl, Officer Vaughn, and the Spokane Public Library seeking declaratory and injunctive relief as well as damages for violations of their First Amendment rights, and a parallel claim under the Washington State Constitution.  The district court dismissed all claims against the Spokane Library with prejudice, but dismissed the rest of the complaint without prejudice, noting the lack of any grounds for municipal liability and an inadequately pleaded First Amendment claim.

In August 2020, Plaintiffs filed an amended complaint against the Spokane Police Department, Police Chief Meidl, and Officer Doe for declaratory relief based on the same First Amendment and parallel Washington State constitutional claims.  Plaintiffs contended that Spokane police officers violated their right to freedom of the press when Officer Doe monitored Yaghtin's communications and intervened in a conversation between Yaghtin and a counterprotester.  Plaintiffs also alleged that the City of

SAVED MAGAZINE v. SPOKANE POLICE DEP'T    9

Spokane adopted the officers' actions as policy "through silent acquiescence."

In their amended complaint, Plaintiffs referred to police body camera footage depicting the Drag Queen Story Hour event, which Defendants included as exhibits in their motion to dismiss. The district court considered these videos under the incorporation-by-reference doctrine when dismissing the amended complaint with prejudice. The district court found that even "after receiving notice from the Court about the deficiencies in the original Complaint," Plaintiffs had not alleged facts to show they were entitled to relief on "any of the modified claims or theories" raised. Thus after "exhaustive examination by the parties and the Court of the Plaintiff Yaghtin's brief and limited interaction with the relevant law enforcement and City officials," the district court concluded that further amendments would be futile.

On appeal, Plaintiffs challenge the district court's First Amendment ruling and contend that the court erred in granting qualified immunity to Officer Doe and in dismissing their claims for lack of municipal liability. Although Defendants raise the issue of whether the district court abused its discretion in dismissing the complaint without leave to amend, Plaintiffs do not challenge the dismissal with prejudice in their opening or reply brief. We do not exercise our discretion to address this issue, and therefore it is waived on appeal. *See In re Riverside Linden Inv. Co.*, 945 F.2d 320, 324–25 (9th Cir. 1991). Plaintiffs also do not appeal the district court's ruling concerning their claim based on the Washington State Constitution.

**JURISDICTION AND STANDARD OF REVIEW**

We have jurisdiction pursuant to 28 U.S.C. § 1291 and review de novo the district court's dismissal for failure to

state a claim. *Okwu v. McKim*, 682 F.3d 841, 844 (9th Cir. 2012) (citing *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 636, 638 (9th Cir. 2012)). We review de novo all constitutional rulings as well as grants or denials of qualified immunity. *See Fournier v. Sebelius*, 718 F.3d 1110, 1117 (9th Cir. 2013) (constitutional rulings); *Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005) (qualified immunity).

## ANALYSIS

### I.

Plaintiffs first argue that the district court erred in concluding that Officer Doe was entitled to qualified immunity because the law underpinning the alleged First Amendment violation was clearly established. Qualified immunity "shields government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When an officer claims qualified immunity, we ask "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019) (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)). Courts have discretion to decide which of the two prongs "should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Addressing the second prong before the first is especially appropriate where 'a court will rather quickly and easily decide that there was

no violation of clearly established law.'" *Jessop*, 936 F.3d at 940 (quoting *Pearson*, 555 U.S. at 239).

We find the "clearly established" prong dispositive here, and so we do not address whether, under the facts as alleged, Officer Doe violated Plaintiffs' constitutional rights. This case is appropriate for resolution on the second prong of *Pearson* because it is difficult to identify the precise constitutional violation Plaintiffs allege in their complaint. Plaintiffs' briefing focuses heavily on their First Amendment right to freedom of the press. In particular, they allege that Officer Doe violated that right when he prevented Yaghtin, acting as a journalist, from "engaging in dialogue with a protester" under threat of arrest. There is no question that news gathering is protected by the First Amendment. *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Generally, however, a journalist's First Amendment rights are no more extensive than those of ordinary members of the public. *See id.* at 683–84; *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669–70 (1991). Therefore, Yaghtin's First Amendment rights were coextensive with those of any other member of the public within the counterprotest zone, and so our inquiry more properly concerns the scope of First Amendment speech rights within that zone.

Plaintiffs argue that their clearly established rights were violated because any officer would know that censoring what someone can say in a public space raises serious First Amendment issues that we must review applying strict scrutiny. Plaintiffs' arguments rely on abstract formulations of First Amendment law that define their rights "at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015)). As the Supreme Court explained, however, "clearly established law must be 'particularized' to

the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). If this is not done, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson*, 483 U.S. at 639.

It is of course true that government officials may not exclude persons from public places who are engaged in "peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express." *Wood v. Moss*, 572 U.S. 744, 756–57 (2014). "It is equally plain that the fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views 'whenever and however and wherever they please.'" *Id.* at 757 (quoting *United States v. Grace*, 461 U.S. 171, 177–78 (1983)). The question for our purposes, however, is much narrower: Was the right asserted by Yaghtin so "clearly established" that "a reasonable officer would have known that his conduct violated" that right? *Romero v. Kitsap County*, 931 F.2d 624, 628 (9th Cir. 1991).

Applying a typical First Amendment framework to Plaintiffs' claim leaves us with the proverbial task of trying to fit a square peg in a round hole. In most cases where restrictions on speech are challenged pursuant to the First Amendment, we ask whether a legislative act, such as a city ordinance or permit scheme, unconstitutionally infringes on speech. *See, e.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1117, 1128 (9th Cir. 2005) (analyzing an emergency city order prohibiting access to portions of downtown); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 124–27, 130 (1992) (analyzing a county's assembly and parade fee

ordinance); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 289, 293 (1984) (analyzing a regulation prohibiting camping in certain parks). But Plaintiffs do not challenge a city ordinance or permit scheme, and they expressly do not challenge the Spokane Police Department's use of separate protest zones. Instead, Plaintiffs' challenge is directed at Officer Doe's *enforcement* of these zones. We are not aware of any precedent that would alert Officer Doe that his enforcement would violate clearly established First Amendment law.

Our decision in *Grossman v. City of Portland* is instructive on this point. 33 F.3d 1200 (9th Cir. 1994). In *Grossman*, we granted qualified immunity to an officer because his "allegedly unconstitutional action" was simply to enforce "an ordinance which was duly enacted by the city council." *Id.* at 1209. Although we concluded that the ordinance violated the First Amendment, the officer's enforcement of that ordinance was not clearly unconstitutional. *Id.* at 1207–08. This is because law enforcement officers may generally reasonably assume that "policies or orders promulgated by those with superior authority" are constitutional unless those policies or orders are "patently violative of fundamental constitutional principles." *Id.* at 1209. In *Grossman*, we granted qualified immunity to the officer even though we concluded the ordinance was unconstitutional because the ordinance "was not so obviously unconstitutional as to require a reasonable officer to refuse to enforce it." *Id.* at 1210. Here, Plaintiffs do not even allege that the underlying protest zone scheme was unconstitutional, much less "patently" unconstitutional.

The D.C. Circuit's qualified immunity decision in *Kroll v. United States Capitol Police*, 847 F.2d 899 (D.C. Cir. 1988), is also persuasive. In *Kroll*, the plaintiff sued a group

of police officers for allegedly violating his First Amendment rights when they arrested him for protesting a ceremony to welcome Olympic torchbearers without a permit. *Id.* at 900–01. Even though the officers considered the content of the plaintiff's message to determine that it "conflicted with the spirit" of the event, the D.C. Circuit held that the officers were entitled to qualified immunity. *Id.* at 901. The court noted that based on the underlying facts of the case, the officers could have "reasonably believe[d] that they were enforcing a valid permit system," and an officer could reasonably conclude that to enforce "a permit system inevitably requires taking cognizance of content." *Id.* Making judgments about "the message being conveyed by a particular demonstrator," is inherent to implementing a permit system because otherwise officers "would have been authorized to issue permits, but do nothing when counterdemonstrators chose to intrude into the area of the 'permitted' activity and carry on their efforts to communicate a different (or indeed possibly conflicting) message." *Id.*

Our decision in *Grossman* and the D.C. Circuit's reasoning in *Kroll* apply here. Plaintiffs do not challenge the constitutionality of dividing protestors and counterprotestors into separate zones. Consequently, it would make little sense to conclude that Officer Doe violated clearly established First Amendment law by enforcing the separation of persons expressing particular views within those zones.[3] A reasonable person in Officer Doe's position

---

[3] To emphasize, we need not, and do not, address the antecedent question of whether the Spokane Police Department's separate protest zone scheme was constitutional because Plaintiffs have expressly declined to challenge this issue. Accordingly, we have no policy or legislative scheme to review.

SAVED MAGAZINE V. SPOKANE POLICE DEP'T  15

could have concluded that the Constitution permitted his relatively modest efforts to prevent Yaghtin from provoking counterprotestors in their designated zone, even if his actions involved restricting Yaghtin's speech. As with the officers in *Kroll*—who, it should be noted, took the more heavy-handed approach of arresting the plaintiff, 847 F.2d at 901—Officer Doe determined that Yaghtin's speech was contrary to the purpose of the counterprotestor zone and prevented him from engaging further on those certain topics.

Considering the lack of any precedent to the contrary, it was not unreasonable for Officer Doe to believe that it was lawful for him to examine the substance of Yaghtin's speech in order to enforce the separate protest zone policy. *Cf. Hill v. Colorado*, 530 U.S. 703, 721 (2000) ("We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct."). The fact that there was an underlying, uncontested governmental scheme distinguishes this case from others where officers acted entirely on their own initiative and arbitrarily restricted speech. *See, e.g.*, *Snell v. City of York,* 564 F.3d 659, 669 (3d Cir. 2009) (holding that a speech restriction in the form of an *ad hoc* oral directive by a police officer, without any guiding formal policy, presents a risk of arbitrary enforcement warranting heightened scrutiny). Consequently, Officer Doe is entitled to qualified immunity on the second prong of the *Pearson* analysis.

## II.

Plaintiffs also contend the district court erred in dismissing their First Amendment claim against the Spokane Police Department. Plaintiffs argue that four facts in their complaint, taken together, amount to a policy, custom, or practice under *Monell v. New York City Department of*

*Social Services*, 436 U.S. 658 (1978): (1) Officer Vaughn's threat to arrest Yaghtin if he caused problems or acted outside his role as a reporter, (2) Officer Doe's actions in telling Yaghtin what he could not say within the counterprotest zone, (3) the radio log statements that "fake press people" were at the event, and (4) the Assistant City Attorney's silence to Plaintiffs asking whether the officers' conduct represented official police department policy.

The district court dismissed Plaintiffs' claim, holding that the Spokane Police Department was not a separate legal entity subject to suit under 42 U.S.C. § 1983. On appeal Plaintiffs do not challenge or present any argument about this particular holding, and so we do not address it. Rather, Plaintiffs briefs appear to focus on the district court's alternative holding that even if Plaintiffs had sued the City of Spokane, their claim would still fail for lack of *Monell* liability.

The City of Spokane cannot be held liable because even assuming Spokane police officers violated Yaghtin's First Amendment rights, nothing in the complaint plausibly alleges a policy, custom, or practice leading to that violation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs' allegations amount to no more than an "isolated or sporadic incident[]" that cannot form the basis of *Monell* liability for an improper custom. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Plaintiffs cite no law in support of their theory that a city's silence about a single incident can support the finding of a city-wide custom. "When one must resort to inference, conjecture and speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom." *Id.* at 920.

## CONCLUSION

Officer Doe is entitled to qualified immunity because Plaintiffs have not identified any clearly established right that Officer Doe violated. Plaintiffs have also not plausibly alleged any City of Spokane policy, practice, or custom sufficient to establish *Monell* liability. The judgment of the district court is therefore affirmed.

**AFFIRMED.**